**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

ALAN EUGENE ADDISON,

        Movant,

    v.

UNITED STATES OF AMERICA,

        Respondent.

CIVIL ACTION NO.: 2:16-cv-138

(Case No.: 2:15-cr-8)

**ORDER and MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

On February 18, 2016, this Court sentenced Alan Eugene Addison ("Addison") to 110 months' imprisonment following his guilty plea to conspiracy to possess with intent to distribute controlled substances and to distribute controlled substances. Addison, who is currently incarcerated at the Federal Correctional Institution in Fort Dix, New Jersey, has now filed a Motion to Vacate, Set Aside, or Correct his Sentence pursuant to 28 U.S.C. § 2255. (Doc. 799.)[1] Addison contends that errors by the Court and his trial counsel plagued his guilty plea and sentence. As laid out below, Addison's far-reaching claims lack merit. Addison's sentence resulted from his own admitted criminal conduct and extensive criminal history, not any errors by the Court or his counsel.

For these reasons, which I detail more fully below, I **RECOMMEND** the Court **DENY** Addison's Motion to Vacate, Set Aside, or Correct his Sentence. Further, I **RECOMMEND** that the Court **DENY** Addison a Certificate of Appealability and *in forma pauperis* status on appeal.

---

[1]  The pertinent record documents in this case are filed on the docket of Addison's criminal case, United States v. Addison, 2:15-cr-8 (S.D. Ga. April 8, 2015), and many are not included in Addison's civil docket. Thus, for ease of reference and consistency, the Court cites to Addison's criminal docket in this Order and Report and Recommendation.

The Court should **DIRECT** the Clerk of Court to **CLOSE** this case and enter the appropriate judgment of dismissal.[2]

## BACKGROUND

On April 8, 2015, the grand jury for this District returned a seven-count Indictment against Addison and seventeen co-Defendants.  (Doc. 3.)  The grand jury charged Addison with conspiracy to possess with intent to distribute, and to distribute, a quantity of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (Count 1).  (Id.)  The Government asserted in its Penalty Certification that Addison faced not more than twenty years' imprisonment as to Count One.  (Doc. 4.)  At Addison's initial appearance and arraignment, he was notified that the maximum penalty he faced as to Count One was twenty years' imprisonment.  (Doc. 192.)

Addison and his appointed attorney, Mr. Wallace E. Harrell, III, were able to negotiate a plea agreement with the Government whereby Addison agreed to plead guilty to Count One and to waive his rights to appeal and collaterally attack his sentence with limited exceptions. (Doc. 465.)  Further, if Addison decided to cooperate, he agreed to provide full and truthful information to the Government.  (Id.)  In exchange, the Government agreed to not object to a recommendation from the probation officer that Addison receive a three-level reduction for acceptance of responsibility and to not file a 21 U.S.C. § 851 enhancement.  (Id.)  Additionally,

---

[2]  Addison is not entitled to an evidentiary hearing.  Addison has the burden of establishing the need for an evidentiary hearing.  Birt v. Montgomery, 725 F.2d 587, 591 (11th Cir. 1984).  He would be entitled to a hearing only if his allegations, if proved, would establish his right to collateral relief.  Townsend v. Sain, 372 U.S. 293, 307 (1963).  "Under Rules Governing Section 2255 Cases, Rule 4(b), a district court faced with a 2255 motion may make an order for its summary dismissal '[i]f it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings in the case that the movant is not entitled to relief[.]'"  Broadwater v. United States, 292 F.3d 1302, 1303 (11th Cir. 2002).  Accordingly, no hearing is required when the record establishes that a Section 2255 claim lacks merit.  United States v. Lagrone, 727 F.2d 1037, 1038 (11th Cir. 1984).  Additionally, the Court need not hold a hearing where the record reveals the claim is defaulted.  McCleskey v. Zant, 499 U.S. 467, 494 (1991).  Addison has not established any basis for an evidentiary hearing because the record reveals that all of the issues he raises either lack merit or are procedurally defaulted, waived, or barred.

the Government agreed that, if Addison chose to cooperate, it would consider whether Addison's cooperation with the Government qualified as "substantial assistance" and warranted the filing of a motion for downward departure. (Id.)

On July 7, 2015, Addison appeared before the Honorable Lisa Godbey Wood for a change of plea, or Rule 11, proceeding. (Doc. 461.) At the hearing, Judge Wood engaged in an extensive plea colloquy with Addison. She explained to Addison that the decision to plead guilty was an important one, that the decision was entirely his decision, and that she wanted to be certain that Addison understood all of the important considerations that go into the decision. (Doc. 803, pp. 2–3.) Judge Wood inquired whether anyone had forced Addison to plead guilty, and he said no one had done so and that pleading guilty was what he wanted to do. (Id. at p. 3.)

Judge Wood had Addison placed under oath before asking him a series of questions. (Id.) He was able to recount his personal information, including his age, the ages of his children, and his residence. (Id. at p. 4.) Addison testified that he reached the twelfth grade and held a number of jobs. (Id. at p. 5) Addison then stated that his only physical or mental injury or disability was ligament damage to his arm, and he affirmed that he was not currently taking any medication. (Id. at pp. 5–6.)

Judge Wood explained to Addison that he was presumed innocent and the Indictment was not evidence of his guilt. (Id. at p. 6.) She also explained that he did not have to plead guilty, and if he chose to persist in his not guilty plea, he would have the right to a public and speedy trial by jury, a presumption of innocence during that trial, and the assistance of counsel through every phase of the case. (Id. at pp. 7–8.) Judge Wood told Addison that if he went to trial he could see, hear, confront, and cross-examine the Government's witnesses and evidence, call witnesses on his behalf, and testify himself or remain silent. (Id.) Judge Wood cautioned

Addison he would be waiving these rights if he pleaded guilty.  (Id. at p. 8.)  She explained that, if she accepted his guilty plea, there would be no right to trial of any kind, and that all that would remain of his case would be the sentencing phase.  (Id.)  Addison stated that he understood, and he testified that he had no questions regarding the rights he was waiving.

Addison also stated he and Mr. Harrell reviewed the Indictment together; that he had the opportunity to talk to Mr. Harrell about the facts of his case, the underlying conduct, and the proposed plea agreement; and that Mr. Harrell had discussed the law and the facts pertaining to his case.  (Id. at pp. 8–9.)  Addison specifically stated that he and Mr. Harrell had discussed in general terms the application of the Sentencing Guidelines.  (Id. at p. 9.)  Addison testified that he was satisfied with Mr. Harrell's services and that he had no complaints about Mr. Harrell whatsoever.  (Id.)

Judge Wood reviewed Count One of the Indictment with Addison and discussed the essential elements of the crimes for which he was charged and what the Government would have to prove if he went to trial.  (Id. at pp. 9–11.)  Addison responded that he understood these elements and what the Government would have to prove if he went to trial.  (Id.)  Judge Wood advised Addison of the penalties she could impose on the count to which he was pleading guilty.  (Id. at pp. 11–13.)  Pertinently, she stated, "Now the maximum possible penalty that I could ever impose for a violation of that particular statute is not more than 20 years['] imprisonment, a fine of not more than a million dollars, at least three years supervised release, and a $100.00 special assessment.  Do you understand those are the maximum possible penalties that I could ever impose?"  (Id. at p. 11.)  Addison responded that he understood.  (Id.)  Moreover, Judge Wood explained to Addison that, in imposing a sentence upon him, she would have to take into consideration the advisory Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553,

and she outlined the factors she would consider at sentencing.  (Id. at p. 12.)  Judge Wood asked

Addison if he had any questions about sentencing, and he responded that he did not.   (Id.)

Addison testified that no one had promised him an exact sentence.  (Id.)  Judge Wood explained

that all that anyone could give him is a "best guess" or "estimate" of what his Guidelines' range

would be, and that such an estimate would in no way bind the Court.  (Id. at p. 13.)

Judge Wood affirmed with Addison that he had given Mr. Harrell permission to negotiate

a plea agreement with the Government.  (Id. at pp. 15–16.)  She then asked the Assistant United

States Attorney ("AUSA") to summarize the provisions of the plea agreement.  AUSA Greg

Gilluly stated:

> It is a[n] 11-page document, that plea agreement, and I will summarize the
> material provisions there as follows.
>
> The Government agrees to not object to a recommendation from the probation
> officer that the defendant receive a three-level reduction for acceptance of
> responsibility based upon the timeliness of his guilty plea and provided that he
> truthfully admits the conduct comprising the offense of conviction and provided
> that he has complied with the terms of pretrial release and has not engaged in any
> criminal conduct subsequent to arrest or initial appearance in this matter.
>
> The Government agrees not to file an enhancement pursuant to Title 21 United
> States Code Section 851 if applicable as to the defendant.  The Government
> agrees to consider whether the defendant's cooperation with the Government
> qualifies as substantial assistance and warrants the filing of a motion for
> downward departure below any applicable guideline range or mandatory
> minimum sentence or a motion to reduce sentence.
>
> The defendant agrees to plead guilty to Count 1 of this indictment.  He agrees to
> acknowledge at the time of the plea the truth of the factual basis that is contained
> within the plea agreement.   And he agrees to pay the mandatory special
> assessment imposed by The Court on the date of sentencing.
>
> The defendant, if he cooperates, will provide full, complete, candid cooperation to
> the Government, and the Government in his sole discretion will decide whether
> the cooperation qualifies as substantial assistance that warrants the filing for a
> downward departure or a reduction in sentence.

> There is a waiver of appeal in this plea agreement.  There is also a waiver of collateral attack in this plea agreement that I will leave to The Court.

(Id. at pp. 13–15.)  Judge Wood asked Addison if AUSA Gilluly's summarization of the plea agreement was consistent with the plea agreement he signed, and he stated it was.  (Id. at p. 17.) Addison also stated he read the plea agreement, and Mr. Harrell answered any questions Addison had before Addison signed the agreement.  (Id.)  Addison reaffirmed that no one had made him any promises regarding the outcome of his case other than the provisions contained in the plea agreement.  (Id.)

Judge Wood then specifically addressed the direct appeal waiver with Addison, stating the following:

> I want to pick back up on something that Mr. Gilluly mentioned, and that is this plea agreement that you're proposing does contain a waiver of certain appellate rights.  It states "Defendant entirely waivers his right to a direct appeal of his conviction, and the defendant agrees to waive his right to appeal his sentence." There are three exceptions to that waiver.  That is, if and only if one of these three things were to occur you would have a direct appeal right.
>
> Number 1, if I were to sentence you above the statutory maximum, then you could appeal that directly.  Number 2, if I were to sentence you above the advisory guideline range as found by me, then you could appeal that directly.  Or Number 3, if the Government were to file a direct appeal, then you, too, could file a direct appeal, but otherwise, by virtue of the plea agreement, you waive all other direct appellate rights; understand?

(Id. at p. 16.)  Addison stated he understood the appeal waiver provision.  (Id.)

Judge Wood also explained that the proposed plea agreement contained a waiver of certain of Addison's collateral attack rights.  She explained:

> The agreement also contains a waiver of collateral attack rights.  It states "Defendant entirely waives his right to collaterally attack his conviction and sentence on any ground and by any method, including but not limited to a 28 USC Section 2255 motion."  The only exception to that waiver is you do retain the right to collaterally attack your conviction and sentence based on a claim of ineffective assistance, but otherwise, by virtue of this plea agreement, you waive all other collateral attack rights; do you understand?

6

(Id. at pp. 16–17.)  Addison replied that he understood the collateral attack waiver provision and that he did not have any questions about it.  (Id. at p. 17.)

Judge Wood asked Mr. Harrell and AUSA Gilluly whether they were aware of any impropriety on the part of the Government in handling Addison's case, and they both responded in the negative.  (Id. at p. 17.)  Judge Wood then asked Addison whether he wished to still plead guilty to Count One if the Indictment because he was in fact guilty of that count, and Addison answered in the affirmative.  (Id.)  Judge Wood also asked Addison whether he understood the rights and privileges he was waiving if she accepted his plea, and he said he did.  (Id.)

Judge Wood determined that Addison's decision to plead guilty was knowing, intelligent, and voluntary.  (Id. at pp. 17–18.)  She also found that he had the services of "a competent [d]efense lawyer, who has gone over the facts and the law, the plea agreement, the indictment, [and] the sentencing guidelines."  (Id. at p. 18.)  Addison responded in agreement with Judge Wood's conclusions.  (Id.)

Michael Scott Sapp, a member of the Brunswick, Georgia, Police Department assigned to the FBI Violent Crime Task Force, provided the Government's factual basis for the plea.  (Id. at pp. 19–20.)  Sapp testified that he participated in an investigation of the Arron Clark/Christopher Young drug trafficking organization.  (Id. at p. 19.)  That investigation revealed that Addison was a member of the conspiracy that was operating in Brunswick, Georgia.  (Id. at p. 19.)  Sapp described Addison's "role in particular[.]"  (Id. at p. 20.)  Sapp testified that Addison was "one of the sources of supply and supplied quantities of cocaine to Arron Clark as well as Chris Young so that they could redistribute cocaine to other members of the conspiracy and users here in the Southern District of Georgia."  (Id.)  Mr. Harrell had no questions for Sapp on cross-examination.  (Id.)

Upon questioning from Judge Wood, Addison testified that he did not dispute any of the testimony given by Sapp, and he admitted to the truth of Sapp's testimony.  (Id. at pp. 20–21.) Judge Wood found that there was a factual basis for the plea of guilty, accepted Addison's plea, and adjudged him guilty of Count One of the Indictment.  (Id. at p. 21.)  Judge Wood advised Addison that the Probation Office would prepare a Pre-Sentence Investigation report ("PSI"), and the Court would schedule a sentencing hearing after the PSI was disclosed to the Government and the defense.  (Id.)

Prior to Addison's sentencing hearing, United States Probation Officer Ernest J. Orlando prepared a PSI.  Probation Officer Orlando detailed Addison's offense conduct and criminal history and calculated Addison's advisory Guidelines' range.  Probation Officer Orlando detailed Addison's involvement in the Clark Drug Trafficking Organization ("DTO").  (PSI, ¶¶ 4–14.) Probation Officer Orlando explained that the investigation of the organization involved numerous investigative techniques, including the collection of pen register data and the monitoring of telephone communications.  (Id. at ¶¶ 4–6.)  The telephone calls and text messages between Clark and Addison revealed several instances from November 8 through December 3, 2014, where Addison supplied Clark with cocaine.  (Id. at ¶¶ 7–13.)  Based on the amount of drugs Addison and Clark discussed during those communications, Probation Officer Orlando "conservatively" attributed 254.61 grams of cocaine hydrochloride to Addison.  (Id. at ¶ 14.) Probation Officer Orlando noted that "the wire intercept was in place 30 days; however, the preponderance of the evidence supports the conclusion that Addison was involved with the DTO for a much longer period."  (Id.)

Nonetheless, Probation Officer Orlando used the "conservative" amount of 254.61 grams to calculate Addison's Guidelines' range.  (Id. at ¶ 20.)  Probation Officer Orlando explained

that, under U.S.S.G. § 2D1.1, an offense that involves more than 200 grams but less than 300 grams of cocaine has a base offense level of 18.  (Id.)  However, because Addison was at least eighteen (18) years old at the time of the instant offense, the instant offense was a controlled substance offense, and Addison had at least two prior convictions for either a crime of violence or a controlled substance offense, he qualified as a career offender under U.S.S.G. § 4B1.1.  (Id. at ¶ 26.)  Under Section 4B1.1(b)(2), because Addison's maximum statutory penalty was twenty (20) years, his base offense level was 32.[3]  Addison's offense was reduced by three points due to his acceptance of responsibility for a total offense level of 29.  (Id. at ¶¶ 27, 28.)

The Probation Officer detailed Addison's extensive list of adult criminal convictions. (Id. at ¶¶ 31–49.)  Pertinently, Probation Officer Orlando detailed a 1989 conviction for sale of cocaine, (id. at ¶ 31); a 2001 conviction for possession of cocaine with intent to distribute, (id. at ¶ 45); and a 2003 conviction for possession of cocaine with intent to distribute, (id. at ¶ 46). Because Addison was a career offender, his criminal history category was VI.  (Id. at ¶ 50.) Probation Officer Orlando stated that Addison's statutory maximum term of imprisonment was twenty years.  (Id. at ¶ 78.)  According to the PSI, Addison's Guidelines' range for imprisonment was 151 to 188 months.  (Id. at ¶ 79.)  Officer Orlando identified Addison's substantial assistance to authorities as a factor that may warrant departure from the Guidelines' range under Section 5K1.1.  (Id. at ¶ 93.)

Prior to Addison's sentencing hearing, the Government filed a motion for downward departure requesting that the Court sentence Addison below the Guidelines' range due to his substantial assistance in the investigation and prosecution of others.  (Doc. 689.)  The Government explained that Addison was one of the first defendants to plead guilty and to

---

[3] "[I]f the offense level for a career offender from the table . . . is greater than the offense level otherwise applicable, the offense level from the [career offender table] shall apply."  U.S.S.G. § 4B1.1(b).

cooperate.  (Id.)  In support of its request that the Court give Addison a lower sentence, the Government specifically cited Addison's provision of historical information concerning the quantity of drugs Addison provided to Arron Clark.  (Id.)

Addison appeared before Judge Wood for a sentencing hearing on February 18, 2016. (Doc. 694.)  At that hearing, Judge Wood heard from Addison, Addison's counsel, and counsel for the Government regarding Addison' potential sentence.  (Doc. 802.)  This colloquy began by Judge Wood asking Addison if he had an opportunity to read the PSI and discuss it with Mr. Harrell.  (Id. at pp. 2–3.)  Mr. Addison responded that he had.  (Id. at p. 3.)  Mr. Harrell then confirmed that there were no objections to either the factual accuracy of the PSI or the Probation Officer's application of the Guidelines.  (Id.)  There being no objections from the Government or Addison, Judge Wood adopted the PSI's findings of fact and conclusions regarding the advisory Guidelines' range.  (Id.)  In accordance with the PSI, Judge Wood determined that Addison's offense level was twenty-nine, and his criminal history category was six.  (Id.)  Thus, the Guidelines called for a sentence between 151 to 188 months in prison.  (Id.)

Judge Wood then heard from the Government regarding its Section 5K motion for a downward departure due to Addison's substantial assistance to authorities.  (Id. at pp. 3–5.) AUSA Charlie Bourne explained that Addison testified before the grand jury and that he was truthful and forthright with regard to his role in the conspiracy.  (Id.)  AUSA Bourne explained that Addison first directly supplied powder cocaine to Arron Clark and then later provided it indirectly through Beverly Tyson.  (Id.)  AUSA Bourne explained that Addison stopped dealing with Clark directly, because Addison was aware of Clark's gang's reputation for violence.  (Id.) AUSA Bourne stated that Clark was one of the earliest Defendants to cooperate and that his cooperation was significant and warranted a downward departure.  (Id.)

Mr. Harrell called Addison's brother, Ethan Troy Addison, to testify on Addison's behalf. (Id. at pp. 6–9.) Ethan explained that Addison had made positive changes in his life beginning in the year 2004, and that the incidents giving rise to his charges before the Court were due to a "relapse" after their father passed away in the year 2013. (Id. at pp. 6–8.) Upon questioning from Mr. Harrell, Ethan further testified that Addison had numerous family members who would support him following his sentence and that he had never been involved in any gang activity. (Id. at pp. 8–9.) Mr. Harrell then offered arguments in mitigation of sentence, including Addison's battle with addiction, his contrition, and the fact that he was not involved in any gang or violent activity. (Id. at pp. 10–11.) AUSA Bourne then addressed the Court and stated:

> I just want to reiterate what a favorable offer and acceptance and deal that Mr. Harrell got for Mr. Addison because, absent this deal, the Government would be seeking a maximum punishment of 20 years given this defendant's criminal history, but because Mr. Harrell and Mr. Addison came to the decision of pleading and cooperating, he got the three levels off for acceptance. We filed a pretty strong 5K motion and he's looking at a potentially much more lenient sentence than what we would be asking for.
>
> I ask The Court to weigh his atrocious criminal history against the fact that he did cooperate and was one of the few against this violent gang and we have no evidence of any violence on his part.

(Id. at p. 11.) Addison then addressed the Court and stated the following:

> First, I would like to apologize to the family and The Court for having me here again, to my family for letting them down, for failing them as a son, a father, brother and as a husband-to-be.
>
> I am truly sorry and not only have I affected my family and friends, I affected the community by not being a responsible law-abiding man I should have been–I should have been–I should have been.
>
> I have made several mistakes in my life, and I truly want to apologize to you[]all. Nobody deserves what I put onto them.
>
> Yes, Your Honor, I have made a lot of mistakes and I truly regret every one of them. I have an addiction to marijuana and cocaine. I made people think I was

somebody else to support my habit.  My addiction is a disease that needs help.
Yes, Your Honor, I need help, and I am asking you for help.

My addiction has really ruined my life, and I pray every night and morning that
my higher power don't let my kids follow in my footsteps.

I pray the life–I pray the life that they seen me go through that they don't want to
walk in it.  I started using drugs at an early age, drinking and smoking marijuana.
Then I started using cocaine.  Cocaine took me to another level in my life.

I ran off with people's money to support my habit.  I've gotten people money and
brought them back fake drugs just to support my high.  I have been shot and
robbed in front of my kids but my addiction wouldn't let me stop.  I let the drugs
take over my life.  I was addicted to a disease that I couldn't cure and that is what
brought me in front of you today, Your Honor.

Yes, I admit that I do have a serious problem with the use of drugs.  I truly do
need help and I want to get help.  I want to be cured of this terrible disease.

Your Honor, while I have been locked up I received my GED within the nine
months.  I've gotten closer to my higher power.  I want to attend vocational
school and vocational training while I'm locked up.  I want to obtain a better
education and any skills I can use when I get out of prison to better myself and to
stay out of prison and to become a successful and productive citizen in the
community so I can become the man my parents raised me to be.  Your Honor, I
take full responsibility for the crime I committed and I truly am sorry.  I've made
mistakes in my life.

I throw myself at the mercy of This Court and truly hope you have it in your heart
to have mercy on me in sentencing.  Thank you, and again, I truly am sorry to
everyone and my family.

(Id. at pp. 12–13.)

Judge Wood then stated that she had listened to all of the information that had been

presented, including the PSI, the testimony, Mr. Harrell's arguments, the Government's 5K

motion, and Addison's "very sincere statement."  (Id. at pp. 13–14.)  She explained that she had

thought deeply about how the federal sentencing statute and its factors apply to Addison's case.

(Id. at pp. 13–14.)  Based on all of that information and consideration, Judge Wood pronounced a

sentence of 110 months' imprisonment.  (Id. at p. 14.)  Judge Wood explained that she departed

downward from the advisory Guidelines' range due to Addison's substantial assistance to the Government and his contrition.  (Id.)  Judge Wood advised Addison that he waived his right to appeal with limited exceptions, pursuant to his plea agreement, but advised Mr. Harrell to review the notice of post-conviction obligation with Addison.  (Id. at p. 15.)  The Court entered judgment of 110 months' imprisonment on February 19, 2016.  (Doc. 698.)

On February 26, 2016, Mr. Harrell filed a Post-Conviction Consultation Certification. (Doc. 711.)  That certification, signed by both Addison and Mr. Harrell, stated that Mr. Harrell explained to Addison the appellate process, advised him of his right to appeal, and discussed the advantages and disadvantages of filing an appeal.  (Id.)  Mr. Harrell and Addison also certified that Mr. Harrell thoroughly inquired of Addison whether Addison wanted to file an appeal and that Addison:

> has decided not to file an appeal, and [Mr. Harrell has] explained to him/her the consequences of failing to do so.  Those consequences include the waiver of his/her right to complain about the process that led up to his/her conviction, including in the future, should he/she decide to seek any form of habeas corpus, 28 U.S.C. § 2255, or other judicial relief from the conviction.

(Id.)  Addison did not file a direct appeal of his conviction or sentence.

## DISCUSSION

Addison filed the instant Section 2255 Motion on October 11, 2016.  (Doc. 799.) Addison raised three arguments in support of his Motion: (1) that the Court "miscomprehended" the Guidelines' definition of minor role participant and failed to give him a two-point reduction in his Guidelines' range, (id. at p. 4.);[4] (2) that Mr. Harrell failed to properly counsel Addison during the plea bargaining stage regarding Addison's cooperation and the maximum penalty he

---

[4]  Addison did not offer any arguments in support of this ground in this Reply and only stated that the Court should grant relief on "issues two and three in his Section 2255 motion."  (Doc. 844, p. 2.)  Thus, it appears he has abandoned this claim.  However, given that Addison has not expressly withdrawn this claim, the Court assesses the claim.

faced, (id. at pp. 7, 14); and (3) that Mr. Harrell failed to inform Addison of the "benefits and detriments" of not filing a direct appeal, (id. at p. 5.). The Government filed a Response to Addison's Motion, (doc. 813), and Addison filed a Reply, (doc. 844).

## I.      Addison's Claim to a Mitigating Role Reduction

The United States Sentencing Guidelines provide for a decrease in a defendant's offense level when the defendant plays a minimal or minor role in any criminal activity. Specifically, Section 3B1.2 provides:

Based on the defendant's role in the offense, decrease the offense level as follows:

(a)      If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.

(b)      If the defendant was a minor participant in any criminal activity, decrease by 2 levels.

In cases falling between (a) and (b), decrease by 3 levels.

U.S.S.G. § 3B1.2.

At the time of Addison's sentencing, the commentary to Section 3B1.2 described the mitigating-role adjustment as applying to "a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant." U.S.S.G. § 3B1.2 cmt. n.3 (2015). The commentary provided, "For example, a defendant who is convicted of a drug trafficking offense, whose participation in that offense was limited to transporting or storing drugs and who is accountable under §1B1.3 only for the quantity of drugs the defendant personally transported or stored may receive an adjustment under this guideline." Id. The commentary also described a "minimal participant" as one who is the least culpable and may lack "knowledge or understanding of the scope and structure of the enterprise and of the activities of others," while the "minor participant" is one who is less culpable than most other

participants "but whose role could not be described as minimal." U.S.S.G. § 3B1.2 cmt. nn.4, 5 (2015). Further, the commentary noted that "[a] defendant who is accountable under § 1B1.3 (Relevant Conduct) only for the conduct in which the defendant personally was involved and who performs a limited function in concerted criminal activity is not precluded from consideration for an adjustment under this guideline." U.S.SG. § 3B1.2 cmt. n.3 (2015). Under the commentary in effect at the time of Addison's sentencing and the present version, the district court's decision regarding whether to apply the reduction is "heavily dependent upon the facts of the particular case." U.S.S.G. § 3B1.2 cmt. n.3(C).

Following Addison's sentence, in November of 2015, the United States Sentencing Commission revised the commentary to Section 3B1.2 but not the language of the actual Guidelines provision. See U.S.S.G. App. C Supp., amend. 794. Amendment 794 made several revisions, including adding a "non-exhaustive list of factors" that the court should consider in determining whether to apply the adjustment. Id. Under the revised version of the commentary,

> In determining whether to apply [a minimal or minor participant adjustment] or an intermediate adjustment, the court should consider the following non-exhaustive list of factors:
>
> > (i) the degree to which the defendant understood the scope and structure of the criminal activity;
> >
> > (ii) the degree to which the defendant participated in planning or organizing the criminal activity;
> >
> > (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
> >
> > (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;
> >
> > (v) the degree to which the defendant stood to benefit from the criminal activity.

U.S.S.G. § 3B1.2.  The Commission also added commentary that "the fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative."  Id. Rather, such a defendant may receive a mitigating role adjustment if he is substantially less culpable than the average participant in the criminal activity.  Id.  The Eleventh Circuit Court of Appeals has held that these amendments to the commentary are clarifying and not substantive amendments and that the amendments, therefore, apply retroactively on direct appeal.  United States v. Cruickshank, 837 F.3d 1182, 1194 (11th Cir. 2016).  However, the Court also stated that the amendments "continue to embrace the approach" that the Eleventh Circuit took in its "leading case" concerning Section 3B1.2, United States v. De Varon, 175 F.3d 930, 945 (11th Cir. 1999).  Id. at 1192–94.

Addison argues that the Court applied an "incorrect definition of the minor role guidelines" at his sentencing hearing.  (Doc. 799, p. 4.)  He argues that applying Amendment 794 would result in his receiving a two-point reduction in his offense level.  (Id.)  The Court should reject this claim for several reasons.

### A.   Addison is not Entitled to a Section 3B1.2 Reduction Under any Version of the Commentary to the Guidelines

Addison fails to recognize that his advisory Guidelines' range was determined by his career offender status under U.S.S.G § 4B1.1 and not due to his role in the offense.  Probation Officer Orlando designated Addison as a career offender in the PSI.  (PSI, ¶ 26.)  At the sentencing hearing, Judge Wood adopted the PSI's conclusion that Addison was a career offender and found that Addison's resulting Guidelines' sentencing range was 151 to 188 months in prison.  (Doc. 802, p. 3.)  Addison did not challenge his career offender status at the sentencing hearing, on direct appeal, or in his Section 2255 Motion.  Even if he had, that

challenge would have been unsuccessful.  Addison unquestionably qualified as a career offender due to his 2001 conviction for possession of cocaine with intent to distribute, (PSI, ¶ 45); and his 2003 conviction for possession of cocaine with intent to distribute, (id. at ¶ 46).

The Eleventh Circuit has repeatedly held that career offenders like Addison cannot receive a mitigating role adjustment under Section 3B1.2.  United States v. Jeter, 329 F.3d 1229, 1230 (11th Cir. 2003) ("Today we make it clear that minor role adjustments are not available to defendants sentenced under § 4B1.1."); see also United States v. Neely, 683 F. App'x 918, 921 (11th Cir. 2017); United States v. Dawson, 542 F. App'x 803, 805 (11th Cir. 2013); United States v. Jackson, 320 F. App'x 919, 920 (11th Cir. 2009); United States v. Ellwood, 188 F. App'x 935, 941 (11th Cir. 2006).  Thus, given Addison's career offender status, regardless of what version of Guidelines' commentary applies, the Court did not err by not giving Addison a reduction in offense level under Section 3B1.2.

Moreover, even if Addison's career offender status did not bar him from receiving a Section 3B1.2 reduction, the facts of his case in no way warrant the reduction.  When determining a defendant's role in the offense, a district court "must measure the defendant's role against the relevant conduct for which [he] has been held accountable."  DeVaron, 175 F.3d at 940.  "In other words, the district court must assess whether the defendant is a minor or minimal participant in relation to the relevant conduct attributed to the defendant in calculating [his] base offense level."  Id. at 941.  Because the Court only considered Addison's actual drug sales as relevant conduct, he cannot point to the larger conspiracy of his co-Defendants and argue that he played a minimal role relative to that larger enterprise.  Ellwood, 188 F. App'x at 942 (citing DeVaron, 175 F.3d at 944).

Given that Addison was only held accountable for the drugs he sold to Clark, the Court was well within its discretion to conclude that Addison played a significant or important role as to those drugs.  Id.  Indeed, even applying the factors in the revised commentary to Section 3B1.2, it would be absurd for the Court to find that Addison played a minimal role in the relevant transactions.  He was the direct supplier of the cocaine who helped organize the transactions and who directly profited from the transactions.  Addison appears to claim that there is no evidence that he was Clark's supplier of cocaine and that this position was only "inferred."  (Doc. 799, p. 4.)  Addison's his own sworn testimony before this Court thwarts this contention.  At the Rule 11 hearing, Officer Sapp testified that Addison supplied cocaine to Arron Clark so that Clark and Young could redistribute the cocaine to other members of the conspiracy and drug users.  (Doc. 802, p. 20.)  Addison testified under oath that he did not dispute Sapp's testimony and he admitted to the truth of that testimony.  (Id. at pp. 20–21.)

In sum, Addison's argument that the Court should have reduced his offense level by two levels under Section 3B1.2 has no basis in law or fact.  Thus, the Court should **DENY** this claim on the merits.

### B.   Addison Cannot Raise his Guidelines' Claim in his Section 2255 Motion

Moreover, even if Addison's claim that that the Court should have reduced his offense level under Section 3B1.2 had merit, he cannot raise that argument in his Section 2255 Motion.  As an initial matter, neither the Eleventh Circuit nor the Sentencing Commission has made Amendment 794 applicable to cases on collateral review.  To the contrary, the Eleventh Circuit and the Commission have explained that the amendment to the commentary was only a clarifying amendment that made no substantive change to the Guideline itself.  Cruickshank, 837 F.3d at 1194; U.S.S.G. § 3B1.2, Supp. App. C, amend. 794 (Reason for Amend.) ("This

amendment provides additional guidance to sentencing courts in determining whether a mitigating role adjustment applies."). Under similar circumstances, the Eleventh Circuit held that a defendant cannot use Section 2255 to assert claims that his sentence is contrary to a Guidelines' clarifying amendment enacted after his sentence. Burke v. United States, 152 F.3d 1329, 1331 (11th Cir. 1998). Section 2255 is not intended to be "a substitute for direct appeal," and thus, non-constitutional claims "can be raised on collateral review only when the alleged error constitutes a 'fundamental defect which inherently results in a complete miscarriage of justice [or] an omission inconsistent with the rudimentary demand of fair procedure.'" Id. (quoting Reed v. Farley, 512 U.S. 339, 348 (1994)). The Eleventh Circuit has recognized, "[a]ny miscalculation of the guideline range cannot be a complete miscarriage of justice because the guidelines are advisory." Spencer v. United States, 773 F.3d 1132, 1140 (11th Cir. 2014).

Addison's claim that the Court "misconstrued" Section 3B1.2 at his sentencing hearing is not a constitutional one. Further, this claim does not indicate that he suffered a complete miscarriage of justice or that his sentencing proceeding was tainted by an omission inconsistent with the rudimentary demands of fair procedure. Thus, he cannot raise the claim through Section 2255.

**C.     Addison's Collateral Attack Waiver Bars his Claim that the Court Erred at Sentencing**

The collateral attack waiver in Addison's plea agreement provides yet another barrier to this claim. It is well-settled that waiver of appeal[5] and collateral attack provisions contained in a plea agreement are enforceable if the waivers are knowing and voluntary. United States v. Johnson, 541 F.3d 1064, 1066 (11th Cir. 2008) (citing United States v. Weaver, 275 F.3d 1320,

---

[5] "Appeal" refers to the right to appeal or contest, directly or collaterally, a sentence. United States v. Bushert, 997 F.2d 1343, 1350 & n.17 (11th Cir. 1993). Case law concerning waiver of a direct appeal has also been applied to waiver of the right to collateral proceedings. Vaca-Ortiz v. United States, 320 F. Supp. 2d 1362, 1365–67 (N.D. Ga. 2004).

1333 (11th Cir. 2001)).  "'To establish the waiver's validity, the government must show *either* that (1) the district court specifically questioned the defendant about the provision during the plea colloquy, or (2) it is manifestly clear from the record that the defendant fully understood the significance of the waiver.'"  United States v. Mottola, 394 F. App'x 567, 568 (11th Cir. 2010) (quoting United States v. Benitez-Zapata, 131 F.3d 1444, 1446 (11th Cir. 1997)).  "A waiver of the right to appeal includes a waiver of the right to appeal difficult or debatable legal issues—indeed, it includes a waiver of the right to appeal blatant error."  United States v. Howle, 166 F.3d 1166, 1169 (11th Cir. 1999).  "Waiver would be nearly meaningless if it included only those appeals that border on the frivolous."  Brown v. United States, 256 F. App'x 258, 261–62 (11th Cir. 2007).

As laid out in detail above, Judge Wood engaged in an extensive plea colloquy with Addison at the Rule 11 hearing to be certain that he understood his plea agreement and that his guilty plea was intelligent, knowing, and voluntary.  Judge Wood directly advised Addison regarding his collateral attack waiver and specifically questioned him about it.  (Doc. 802, pp. 16–17.)  She read the waiver to him, explained its plain terms, and asked if he understood it and if he had any questions about it.  (Id.)  Addison responded to Judge Wood, under oath, that he understood the waiver to which he was agreeing and that he had no questions about it.  When a defendant enters a guilty plea pursuant to Rule 11 proceedings, "there is a strong presumption that the statements made during the colloquy are true" and his plea is knowing and voluntary.  United States v. Gonzalez-Mercado, 808 F.2d 796, 800 n.8 (11th Cir. 1987).  Moreover, from the entire record, including the Rule 11 colloquy and the written plea agreement that Addison signed, it is "manifestly clear" that Addison fully understood the significance of the waiver.  Having sworn under oath that he read, understood, and consented to his plea agreement and

having received the benefit of the bargain of that agreement, Addison cannot now dodge the agreement's plain terms.

Having found the collateral attack waiver to be valid, the Court turns to the question of whether the waiver covers Addison's argument that the Court erred by failing to give him a downward departure for his role in the offense.  Through the plain language of the collateral attack waiver, Addison agreed not to collaterally attack his conviction and sentence, including through a Section 225 motion, "on any ground and by any method."  (Doc. 465, p. 5.)  The "only exception" allows Addison to file claims based on ineffective assistance of counsel.  (Id.)  Thus, Addison's collateral attack waiver clearly covers his claim that the Court erred in calculating his Guidelines' range.

For all of these reasons, the Court should **DENY** Addison's claim that the Court erred by failing to reduce his offense level by two levels under Section 3B1.2.

## II.     Addison's Claims of Ineffective Assistance of Counsel

Addison claims Mr. Harrell's performance was deficient in three respects: (1) Mr. Harrell overstated the maximum penalty Addison faced prior to Addison entering a guilty plea, (doc. 799, p. 7); (2) Mr. Harrell failed to "immunize" Addison prior to his providing cooperation to the Government, (id.); and (3) Mr. Harrell failed to inform Addison of the consequences of not filing a direct appeal, (id. at p. 5).

Criminal defendants have a right to effective assistance of counsel at all critical stages of the proceedings.  Strickland v. Washington, 466 U.S. 668 (1984).  This right extends to the entry of a guilty plea, Hill v. Lockhart, 474 U.S. 52, 58 (1985), and during sentencing proceedings, Glover v. United States, 531 U.S. 198, 202 (2001).  A defendant's guilty plea, appeal waiver, or collateral attack waiver does not preclude an ineffective assistance of counsel claim premised on

an involuntary and unintelligent plea.  United States v. Puentes-Hurtado, 794 F.3d 1278, 1281, 1285 (11th Cir. 2005).

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result."  Strickland v. Washington, 466 U.S. 668 (1984).  A convicted defendant must meet two components to establish that counsel's assistance was so defective as to require reversal of a conviction or sentence: (1) his counsel's performance was deficient, i.e., the performance fell below an objective standard of reasonableness, and (2) he suffered prejudice as a result of that deficient performance.  Id. at 685–86.  "If a petitioner cannot satisfy one prong, we need not review the other prong."  Duhart v. United States, 556 F. App'x 897, 898 (11th Cir. 2014).  Thus, if a defendant cannot show prejudice, the Court need not determine whether defendant's allegations show his counsel's performance fell below an objective standard of reasonableness.

The deficient performance requirement concerns "whether counsel's advice was within the range of competence demanded of attorneys in criminal cases."  Hill, 474 U.S. at 56.  There is a strong presumption that counsel's conduct fell within the range of reasonable professional assistance.  Davis v. United States, 404 F. App'x 336, 337 (11th Cir. 2010) (citing Strickland, 466 U.S. at 686).  "It is petitioner's burden to 'establish that counsel preformed outside the wide range of reasonable professional assistance' by making 'errors so serious that [counsel] failed to function as the kind of counsel guaranteed by the Sixth Amendment.'"  LeCroy v. United States, 739 F.3d 1297, 1312 (11th Cir. 2014) (quoting Butcher v. United States, 368 F.3d 1290, 1293 (11th Cir. 2004) (second alteration in original)).  "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the

particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 690. Further, retrospective judicial scrutiny of counsel's performance "must be highly deferential" and must "eliminate the distorting effects of hindsight." Id. at 689. "In evaluating performance, 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" LeCroy, 739 F.3d at 1312 (quoting Strickland, 466 U.S. at 690).

Even if counsel made an error so egregious as to be outside the broad scope of competence expected of attorneys, a movant can obtain relief only if the error caused actual prejudice. Strickland, 466 U.S. at 691–92. "Showing prejudice requires petitioner to establish a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." LeCroy, 739 F.3d at 1312 (internal citation omitted). "The prejudice prong requires a petitioner to demonstrate that seriously deficient performance of his attorney prejudiced the defense." Id. at 1312–13. "The likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter, 562 U.S. 86, 112 (2011). A reasonable probability of a different result "is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

A movant is not entitled to habeas relief "when his claims are merely conclusory allegations unsupported by specifics or contentions that in the face of the record are wholly incredible." Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991). "The allegations must be factual and specific, not conclusory. Conclusory allegations are simply not enough to warrant a hearing." Chavez v. Sec'y Fla. Dep't of Corr., 647 F.3d 1057, 1061 (11th Cir. 2011) (citing San Martin v. McNeil, 633 F.3d 1257, 1271 (11th Cir. 2011)). For a movant proceeding *pro se*, the court will liberally construe the pleading, but he "must suggest (even if inartfully) that there is at

least some factual support for a claim; it is not enough just to invoke a legal theory devoid of any factual basis." Jones v. Fla. Parole Comm'n, 787 F.3d 1105, 1107 (11th Cir. 2015). "An evidentiary hearing may be necessary where the material facts are in dispute, but a [movant] is not entitled to an evidentiary hearing when his claims are merely conclusory allegations unsupported by specifics." Pugh v. Smith, 465 F.3d 1295, 1300 (11th Cir. 2006) (citations omitted). Stated another way, "if a habeas petition does not allege enough specific facts, that if they were true, would warrant relief, the petitioner is not entitled to an evidentiary hearing." Chavez, 647 F.3d at 1060 (citing Allen v. Sec'y Fla. Dep't of Corr., 611 F.3d 740, 763 (11th Cir. 2010)).

Further, because solemn representations at a plea hearing by a defendant, his attorney, and the prosecutor "carry a strong presumption of verity" and "constitute a formidable barrier in subsequent collateral proceedings," a movant's later "presentation of conclusory allegations unsupported by specifics is subject to summary dismissal . . . ." Blackledge v. Allison, 431 U.S. 63, 73–74 (1977) (citing Machibroda v. United States, 368 U.S. 487, 495–96 (1962), and Price v. Johnston, 334 U.S. 266, 286–87 (1948)). "[I]f the Rule 11 plea-taking procedure is careful and detailed, the defendant will not later be heard to contend that he swore falsely." United States v. Stitzer, 785 F.2d 1506, 1514 n.4 (11th Cir. 1986). The statements of a defendant in open court are presumed to be true. See Gonzalez-Mercado, 808 F.2d at 800 n.8. Thus, "[o]nly in the most extraordinary circumstances" will an evidentiary hearing be required to dispose of the later contention that statements made during the change of plea were untruthful." Blackledge, 431 U.S. at 80 n.19.

Here, Addison relies upon wholly conclusory allegations as support for his claims that Mr. Harrell rendered ineffective assistance. He fails to make factual and specific allegations and

largely invokes legal theories without connecting those theories to the actual facts of his case. Furthermore, these allegations contradict the sworn statements Addison made during his Rule 11 hearing and the representations he made in the Post-Conviction Certification.  The Court can resolve Addison's claims without an evidentiary hearing.  Indeed, the Court could dispose of his claims without in-depth analysis due to Addison's conclusory pleadings.  However, the analysis below demonstrates that, even construing Addison's pleadings liberally, he is not entitled to relief.

### A.   Mr. Harrell's Advice During Plea Negotiations Regarding the Maximum Penalty Addison Faced

Addison claims that Mr. Harrell overstated the maximum penalty he faced during plea negotiations.  He contends that counsel told him he could face thirty years' imprisonment absent his guilty plea, even though he was only subject to a twenty-year maximum.

Addison's "knowing and voluntary guilty plea waive[d] all non-jurisdictional, pre-plea defects, including ineffective assistance of counsel with respect to issues not implicating the voluntariness of the plea."  Wilson v. United States, 962 F.2d 996, 997 (11th Cir. 1992).  Given the "careful and detailed" procedure that Judge Wood employed at the plea hearing, Addison cannot now be heard to contradict his own sworn statements at that hearing.

As detailed above, during the Rule 11 hearing, Judge Wood took careful measure to make certain that Addison's plea was knowingly, voluntarily, and intelligently made.  (Doc. 803.) Addison stated that no one was forcing him to plead guilty and that he wanted to plead guilty. (Id. at p. 3.)  Throughout the plea hearing, Addison was able to converse with the Court, recount personal information, and respond to all of the Court's questions.  (Id. at pp. 3–20.)  Having carefully observed and questioned Addison at length, Judge Wood found that Addison was "in full possession of all of this faculties," that he "underst[ood] the consequences of his plea, [and]

the maximum punishment that he faces." (Id. at p. 18.)  Judge Wood concluded that Addison knowingly and voluntarily decided to plead guilty, and Addison testified under oath that he agreed with her assessment.  (Id.)

At no point during his plea hearing did Addison indicate in any way that he did not understand the proceedings and the decision he was making.  At no point did he indicate that he did not understand the wrongfulness of his actions.  To the contrary, he stated that he wanted to plead guilty to Count One because he was indeed guilty of that crime.   (Id. at p. 17.) Importantly, despite given every opportunity to do so, Addison never expressed any confusion whatsoever about the punishment he faced or Mr. Harrell's advice regarding sentencing.

Addison also specifically testified that he and Mr. Harrell had looked over the Indictment together, discussed the law and facts of Addison's case, gone through the plea agreement, and discussed the Sentencing Guidelines.  (Id. at pp. 8–9.)  Addison affirmed that he was satisfied with Mr. Harrell's representation and that he did not have any complaints about that representation whatsoever.  (Id. at p. 9.)  Given this extensive colloquy and Addison's sworn declarations, Addison cannot know be heard to argue that his plea was not knowingly and voluntarily made.  Blackledge, 431 U.S. at 73–74.

Addison claims that his plea was not knowing, intelligent, and voluntary because he misunderstood the maximum penalties he could face if he did not plead guilty.  However, during the Rule 11 hearing, before Addison pleaded guilty, Judge Wood specifically advised him regarding the maximum penalty he could face.  (Doc. 803, p. 11.)  Addison claims that Judge Wood only advised him of the penalties he could face under the guilty plea.  However, the transcript belies his claim.  Judge Wood explained that "the maximum possible penalty that I could **ever impose** for a violation of that particular statute is not more than 20 years[']

26

imprisonment, a fine of not more than a million dollars, at least three years supervised release, and a $100.00 special assessment." (Id. (emphasis supplied).)  She asked if Addison understood that "those are the maximum penalties [the Court] **could ever impose**," and Addison testified that he understood. (Id. (emphasis supplied).)  Additionally, Judge Wood explained the advisory Sentencing Guidelines and the 18 U.S.C. § 3553 sentencing factors. (Id. at p. 12.)  She informed Addison that it would be up to her to determine what his sentence might be and that the sentence may be above, below, or within his Guidelines' range.  Addison testified that he understood Judge Wood's explanation regarding the sentencing process and that he had no questions about it. (Id.)  Addison also testified that no one had promised him an exact sentence. (Id.)  Judge Wood stated, "That's good because at this point all anybody could do is give you their best guess or estimate about what your guideline range might be, but it would in no way be binding upon The Court." (Id. at pp. 12–13.)  Addison testified that he understood.  The plea agreement also emphasized that "[t]he Court is not bound by any estimate of sentence given or recommendations made by the defendant's counsel, and that Defendant will not be allowed to withdraw his plea of guilty if he receives a more severe sentence than he expects." (Doc. 465, p. 2.)

Moreover, Addison was aware of this maximum penalty well before his Rule 11 hearing. The Penalty Certification notified Addison at the beginning of the case that the maximum term of imprisonment for the charge against him was twenty years. (Doc. 4.)  At his arraignment, the Court called upon counsel for the Government to tell Addison the maximum penalties he faced if he was found guilty of the charges against him. (Arr. Hr'g Tr., p. 8.)  The AUSA stated that Addison faced a maximum term of imprisonment of twenty years. (Id.)  The Court asked Addison if he understood the maximum penalties he faced, and Addison responded that he did. (Id.)

Thus, the record reveals Addison was well-apprised of his maximum statutory penalties prior to pleading guilty, and he knowingly, voluntarily, and intelligently pleaded guilty.  He stated under oath that he understood the applicable penalties and that all anyone could do was give him a best guess about his sentence.  As such, through his guilty plea, Addison waived his argument that Mr. Harrell failed to properly advise him of his maximum sentence during his plea negotiations.  See Cruz v. United States, 188 F. App'x 908, 914 (11th Cir. 2006) (no ineffective assistance where movant claimed counsel coerced her into pleading guilty based on misrepresented facts about the case and sentencing because, *inter alia*, "[t]he court . . . explained to her the maximum penalties and that the sentence imposed could be different from any estimate given to her by her lawyer or anyone else."); see also United States v. Smith, 371 F. App'x 901, 905 (10th Cir. 2010) ("[M]iscalculation or erroneous sentence estimation by a defense counsel is not a constitutionally deficient performance rising to the level of ineffective assistance of counsel."); United States v. Miley, 119 F. App'x 330, 332 (2d Cir. 2005) (any prejudice from defense counsel's alleged misrepresentations as to what movant's sentence would be was dispelled by the time movant pleaded guilty and acknowledged that no promises had, in fact, been made to him outside of the plea agreement); United States v. Macon, 91 F. App'x 239, 243 (3d Cir. 2004) ("[W]e have long held that an erroneous sentencing prediction by counsel does not constitute ineffective assistance of counsel where an adequate plea hearing was conducted."); United States v. Arvanitis, 902 F.2d 489, 494–95 (7th Cir. 1990) (no ineffective assistance where claim based only on inaccurate prediction of sentence).

Even if Addison's guilty plea did not waive this claim, he has failed to demonstrate: (1) that Mr. Harrell's performance was deficient, i.e., the performance fell below an objective standard of reasonableness; or (2) that Addison suffered prejudice as a result of that deficient

performance.  Strickland, 466 U.S. at 685–86.  A Section 2255 movant asserting an ineffective assistance of counsel claim in the guilty plea process must establish that counsel's performance was deficient (i.e., professionally unreasonable) and that the deficient performance "affected the outcome of the plea process."  Hill, 474 U.S. at 59.  In other words, to establish prejudice, the movant "must show that there is a reasonable probability that, but for counsel's errors, he would . . . have pleaded [not] guilty and would . . . have insisted on going to trial."  Id.; see also Slicker v. Wainwright, 809 F.2d 768 (11th Cir. 1987) (to be entitled to an evidentiary hearing on whether petitioner's lawyer incorrectly advised petitioner that the negotiated plea agreement provided that he would serve less time than the maximum penalty, petitioner was required to establish that he would not have pleaded nolo contendere and would have insisted on going to trial had his lawyer not misled him with faulty information).

Further, a mere allegation by a defendant that he would have insisted on going to trial but for counsel's errors, although required, is insufficient to establish prejudice.  Rather, "the court must look to the totality of the objective factual circumstances surrounding the plea in order to determine whether there is a reasonable probability that the [movant] would in fact have insisted on trial."  Suarez v. United States, No. 15-CR-20144, 2017 WL 3208725, at *5 (S.D. Fla. June 19, 2017), report and recommendation adopted, No. 16-24003-CIV, 2017 WL 3206328 (S.D. Fla. July 27, 2017) (citing Hill, 474 U.S. at 59; Hutchings v. United States, 618 F.3d 693, 697 (7th Cir. 2010)).  This inquiry will often include an assessment of the strength of the prosecution's case, any available defenses the movant could have asserted at trial, the plea colloquy, and the movant's potential sentencing exposure.  Id.

Other than conclusory allegations that contradict his own sworn statements, Addison has failed to demonstrate that Mr. Harrell misadvised him regarding his potential sentence.  It is

worth noting that Addison focuses on the alleged misimpression that he could receive a thirty-year sentence without the plea agreement.  This actually was a possibility.  Addison had two prior convictions for felony drug offenses.  Thus, had Addison not pleaded guilty and the Government filed a 21 U.S.C. § 851 enhancement, Addison's statutory maximum sentence would have increased from 20 years' to 30 years' imprisonment.  18 U.S.C. § 841(b)(1)(C). However, under the plea agreement, the Government agreed to not file a 21 U.S.C. § 851 enhancement regarding Addison's prior convictions.

Moreover, even if Mr. Harrell had overstated Addison's maximum exposure, the Court repeatedly advised Addison that the maximum penalty he faced as to Count One was twenty years' imprisonment, and Addison repeatedly stated that he understood that was the maximum penalty.  Thus, any prejudice caused by Mr. Harrell's alleged misinformation was cured before Addison pleaded guilty.

Furthermore, Addison offers nothing more than his own bare and self-serving allegations that he would have gone to trial if he had known he only faced a twenty-year maximum penalty. Further, the "totality of the objective factual circumstances" rebuts Addison's conclusory assertion on this point.  Suarez, 2017 WL 3208725, at *5.  The Government's case against Addison was strong, as law enforcement officers recorded him making numerous drug transactions.  Even now, he raises no defense to those tape recordings or any other defense that he would have presented at trial.  Further, if Addison had proceeded to trial, he would have risked a significantly increased sentence (even absent a Section 851 enhancement).  His Guidelines' range would have been 210 to 240 months' imprisonment, approximately double the sentence he received after pleading guilty.[6]  Further, Addison's requested relief in his instant

---

[6]  Without any reduction for acceptance of responsibility, Addison's offense level would have been 32 under U.S.S.G. § 4B1.1.  Combined with a criminal history category of VI, his range would have been

Section 2255 Motion contradicts his assertion that he would have proceeded to trial if he had known that his maximum sentence was only twenty years.  In his Motion, Addison does not request that the Court vacate his guilty plea and set the case for trial.  Rather, he asks that the Court resentence him, allow him to plead guilty to a "substantive possession" charge, or allow him to "plea anew."  (Doc. 799, p. 14; Doc. 844, p. 9.)  Thus, even now, unquestionably aware of the maximum penalties that he is facing, Addison does not relish the prospect of trial.  Thus, he has failed to show that but for Mr. Harrell's alleged errors he would have insisted on going to trial.

For all of these reasons, the Court should **DENY** Addison's claim that Mr. Harrell rendered ineffective assistance of counsel by overstating the maximum penalty Addison faced.

### B.      Mr. Harrell's Assistance Regarding Addison's Cooperation

Addison also claims that Mr. Harrell rendered ineffective assistance regarding Addison's cooperation with law enforcement authorities.  Addison contends that Mr. Harrell should have "immunized" him prior to his proffer to the Government and that Harrell misinformed Addison that the information Addison provided to the Government would not be used at sentencing.  (Doc. 799, p. 7; Doc. 844, pp. 5–6.)  Addison alleges that these errors occurred in the plea negotiation process.  (Id.)  Once again, Addison's claims are belied by his own sworn statements and his plea agreement and waived by his entry of a guilty plea.

As explained above, Addison decided to plead guilty knowingly, voluntarily, and intelligently.  That plea waived this pre-plea claim, which is not jurisdictional and does not

---

210 to 262 months.  However, the maximum statutory sentence of 240 months would have reduced the range to 210 to 240 months.  At the sentencing hearing, the AUSA stated the Government would have sought the statutory maximum if Addison had not entered the plea agreement.  (Doc. 802, p. 11.)  Further, if the Government filed a Section 851 enhancement (which it agreed not to do in the plea agreement), Addison's statutory maximum would have increased to thirty years, and his offense level would have increased to 34.  U.S.S.G. § 4B1.1(b).  This would have subjected him to a Guidelines' range of 262 to 327 months' imprisonment.

implicate the voluntariness of Addison's plea.  <u>Wilson</u>, 962 F.2d at 997.  At his plea hearing,
Addison testified that no one made any promises to him outside of the plea agreement that
induced him to plead guilty and that he was satisfied with Mr. Harrell's representation.
(Doc. 803, pp. 15–16.)

Furthermore, the AUSA explained that, as part of the plea agreement, if Addison
cooperated, he was to "provide full, complete, candid cooperation to the Government, and the
Government in his sole discretion will decide whether the cooperation qualifies as substantial
assistance that warrants the filing for a downward departure or a reduction in sentence."  (<u>Id.</u> at
p. 14.)  Addison agreed, under oath, with this description of the negotiated agreement.  (<u>Id.</u> at
p. 15.)  Moreover, the plea agreement itself, which Addison testified that he read, discussed with
counsel, understood, and agreed to, stated:

> Defendant, if he cooperates, must provide full, complete, candid, and truthful
> cooperation in the investigation and prosecution of the offenses charged in his
> Indictment and any related offenses.  Defendant shall fully and truthfully disclose
> his knowledge of those offenses and shall fully and truthfully answer any question
> put to him by law enforcement officers about those offenses.
>
> This agreement does not require Defendant to "make a case" against any
> particular person.  His benefits under this agreement are conditioned only on his
> cooperation and truthfulness, not on the outcome of any trial, grand jury, or other
> proceeding. . . .
>
> The government, in its sole discretion, will decide whether Defendant's
> cooperation qualifies as "substantial assistance" pursuant to U.S.S.G. § 5K1.l or
> Fed. R. Crim. P. 35 and thereby warrants the filing of a motion for downward
> departure or reduction in Defendant's sentence.  If such a motion is filed, the
> Court, in its sole discretion, will decide whether, and to what extent, Defendant's
> sentence should be reduced.   The Court is not required to accept any
> recommendation by the government that the Defendant's sentence be reduced.

(Doc. 465, p. 4.)

These plain terms of the Plea Agreement and the Rule 11 colloquy directly contradict
Addison's claim that Mr. Harrell should have obtained complete immunity or a lower sentence.

Through his plea agreement and his plea colloquy, Addison clearly agreed to plead guilty without any guarantees regarding his sentence.  He affirmed that the Government would solely decide whether to move for a downward departure and that the Court retained ultimate control over his sentence.

The agreement also thwarts any claim that Mr. Harrell should have advised him to not fully disclose the specifics of his crimes.  The agreement required Addison, if he chose to cooperate, to provide "full, complete, candid, and truthful cooperation" and to "truthfully answer any question put to him."  (Id.)  Moreover, Addison agreed that the Government was not obligated to withhold any information pertinent to his relevant conduct.  (Id. at p. 3 ("The government is free to provide full and accurate information to the Court and U.S. Probation Office for use in calculating the applicable Sentencing Guidelines range.").)  Having entered this agreement knowingly, voluntarily, and intelligently, Addison cannot now claim that Mr. Harrell should have gotten him a better deal.

Even if Addison had not waived this claim through his plea agreement, he has failed to demonstrate that Mr. Harrell rendered ineffective assistance regarding his cooperation.  Addison appears to claim that Mr. Harrell should have secured an agreement whereby Addison "would have been free, or receive a sentence under 36 months[,]" (doc. 799, p. 7).  This contention is grounded in speculation bordering on delusion.  While agreements for immunity or minimal sentences may occur every day in crime novels and television shows, they are exceptionally rare in the real world of federal court.  Addison has not presented any evidence that such an agreement was ever a possibility in this case.  Moreover, nothing in this case or the Court's experience would indicate that the Government would be willing to enter such a plea agreement with Addison or that the Court would have approved such an agreement.  Particularly given

Addison's significant criminal history, the nature of his offense, and the damning evidence against him, there would be no reason to expect that the Government would agree to provide him immunity or recommend a sentence approximately seventy-five percent below the bottom of his Guidelines' range.  Johnstone v. United States, No. 98-CV-7369 (JG), 1999 WL 672946, at *9 (E.D.N.Y. Aug. 25, 1999) (no ineffective assistance where counsel failed to seek immunity when counsel had "no reason to believe that the government would even consider granting immunity in exchange for [the defendant's] testimony").

Addison also claims that Mr. Harrell misadvised him regarding the use of information that he provided to law enforcement.  Again, Addison's plea agreement and colloquy foreclose this claim.  Addison testified that no one had made him any promises outside of the plea agreement regarding the outcome of his case.  (Doc. 803, p. 16–17.)  Further, before Addison entered his guilty plea, the Court explained that it would consider his "actual conduct in this case" when deciding on his sentence.  (Id. at p. 12.)  Additionally, the plea agreement stated that the Government was free to provide "full and accurate" information to the Court and the Probation Office for calculation of the applicable Guidelines' range.  (Doc. 465, p. 3.)

Moreover, Addison has failed to demonstrate that Mr. Harrell's assistance was deficient in this regard.  Addison contends that Mr. Harrell misadvised him by telling him that had to be truthful during his cooperation and that the Government would not use information against him if it was not already known by the Government.  (Doc. 844, pp. 5–6.)  Addison claims that, but for this advice, he would not have told the Government about the details of his drug transactions with Clark.  (Id.)  Specifically, Addison implies that he would have withheld the amount of drugs he sold to Clark.  Again, law enforcement officials learned of these transactions in their pre-Indictment investigation by monitoring telephone calls and texts.

The information Addison contends he would have withheld centers on Addison's own offense conduct. Thus, he provided this information not as cooperation against other Defendants but as part of his own admission of his own conduct. Addison was required to provide this information in order to receive an offense level reduction for acceptance of responsibility. See U.S.S.G. § 3E1.1 App. n.1(A) (when determining whether reduction for acceptance of responsibility is warranted, court should consider whether defendant truthfully admitted conduct comprising offense of conviction and any additional relevant conduct for which the defendant is accountable under Section 1B1.3).

Furthermore, even if this information could be described as cooperation, Addison has failed to prove that Mr. Harrell's advice regarding cooperation was faulty. Probation Officer Orlando limited the relevant conduct in the PSI to the transactions that law enforcement captured through monitoring calls and text messages between Addison and Arron Clark. This conduct was already known to law enforcement absent Addison's cooperation. Addison even admits as much in his Section 2255 pleadings. (Doc. 844, p. 6 ("authorities had recorded conversations that involved Petitioner talking to other members of the Young/Clark DTO about drugs").) The Probation Officer did not detail Addison's broader dealings in the PSI, and the Government did not offer such evidence at sentencing. Thus, it appears Harrell's advice that the Government would only offer transactions against Addison that it already knew about was sound.

Addison claims that the Government would not have known the substances or amounts involved in these transactions but for his cooperation. (Id.) He offers nothing but his conclusory statements to support this claim. Moreover, Addison fails to show prejudice on this front. He claims that the information he provided about the amount of drugs he supplied "was used to give [Addison] a higher base offense level." (Id. at p. 7.) Once again, Addison mistakenly believes

that his base offense level was based on the amount of drugs he sold.  Addison's base offense

level of 32 resulted from his career offender status under U.S.S.G. § 4B1.1.  (PSI, ¶¶ 26, 27, 28.)

It is undisputed that law enforcement officials knew about and had evidence of Addison's drug

dealings prior to his cooperation.  Thus, given his criminal history, he would have received this

offense level no matter the amount of drugs in those dealings.  Put another way, Addison would

not have reduced his Guidelines' calculation by withholding the specifics regarding the amount

of drugs he supplied to Clark.  Rather, the only way to reduce his sentencing exposure was to

cooperate.  Addison did so and received a substantial reduction in his sentence as a result.

Further, the Court should reject Addison's apparent claim that Mr. Harrell should have

counseled him to withhold information or lie during his cooperation.  In addition to the ethical

prohibitions to this strategy, it would have had ruinous consequences for Addison.  For one, this

would have been a breach of Addison's plea agreement and would have sacrificed all of the

benefits he received under that agreement.  Additionally, the Government would not have moved

for a downward departure, and Addison would have lost the forty-one month sentence reduction

he obtained as a result of that motion.  Perhaps most alarmingly, the information that Addison

contends he should have withheld pertains to his own conduct that comprises his offense of

conviction.  If Addison had not truthfully admitted the amount of drugs attributable to him, he

would have almost certainly lost his three-level reduction for acceptance of responsibility.

U.S.S.G. § 3E1.1 App. n.1(A) ("A defendant who falsely denies, or frivolously contests, relevant

conduct that the court determines to be true has acted in a manner inconsistent with acceptance

of responsibility."); see also United States v. Etchin, 614 F.3d 726, 740 (7th Cir. 2010)

(affirming denial of acceptance of responsibility where defendant frivolously contested amount

of drugs attributable to him); United States v. Smith, 13 F.3d 860, 866 (5th Cir. 1994) (drug sale

defendant not entitled to reduction for acceptance of responsibility, even though she admitted conduct comprising offense of conviction, because she refused to admit any connection with additional cocaine found in house for which sentencing court had held her accountable); United States v. Charo, 996 F.2d 1169, 1170–71 (11th Cir. 1993) (affirming denial of acceptance of responsibility reduction where defendant did not truthfully admit the amount of drugs he transported).  In practical terms, if Addison had withheld information regarding the amount of drugs he sold to Clark, he would have likely received a sentence in the range to 210 to 240 months, approximately double the sentence he actually received.

Mr. Harrell and Addison made a strategic choice to provide the Government with information in the hope of reducing Addison's sentencing exposure.  Addison has failed to demonstrate any deficiency in this strategic choice and the advice surrounding it.  Further, this strategy should not be second guessed with the benefit of hindsight.  See Green v. Nelson, 595 F.3d 1245, 1251 (11th Cir. 2010) ("[S]trategic decisions are ones that, among other things, involve a weighing of competing positive and negative consequences that may flow to the defendant from a particular choice."); United States v. Pinkerton, No. CR03-4088 MWB, 2006 WL 2338231, at *8 (N.D. Iowa Aug. 11, 2006) (attorney made "strategic choice" to submit defendant to a full debriefing in order to obtain a sentence reduction for substantial assistance and "once put into context", it is evident "the actions taken by [the defense attorney] were undoubtedly calculated to be in [the defendant's] best interest, and are therefore, unassailable"). Given the evidence against Addison, including recorded phone conversations where Addison agreed to sell cocaine to the leader of a large conspiracy, and his criminal history, it was quite reasonable for Mr. Harrell and Addison to pursue a strategy of cooperation.  Rather than prejudicing Addison, the strategy resulted in his receiving a significantly reduced sentence.

For all of these reasons, the Court should **DENY** Addison's claim that Mr. Harrell rendered ineffective assistance regarding Addison's cooperation.

### C.      Mr. Harrell's Advice Regarding the Filing of an Appeal

"Counsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal . . . or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing."  Roe v. Flores-Ortega, 528 U.S. 470, 480 (2000).  "Even assuming that a rational defendant would not have wanted to appeal the case, [where a defendant] expressly communicated to his attorney his desire to appeal . . .[,] Flores-Ortega mandates that the attorney conduct a specific type of consultation, informing his client about the advantages and disadvantages of appealing and making a reasonable effort to determine the client's wishes."  Gomez-Diaz v. United States, 433 F.3d 788, 792 (11th Cir. 2005).

It is well-settled that an attorney's failure to file a requested notice of appeal is *per se* ineffective assistance of counsel.  Flores-Ortega, 528 U.S. at 470, 483–86; Gaston v. United States, 237 F. App'x 495 (11th Cir. 2007).  A defendant claiming ineffective assistance on that score need not demonstrate an ability to raise meritorious issues on appeal.  Flores-Ortega, 528 U.S. at 477–78.   Instead, he can prove ineffective assistance by showing a "reasonable probability" that he would have timely appealed had counsel not failed to file an appeal on his behalf.  Id. at 484.  Further, even where a defendant has signed a waiver of direct appeal as part of his plea agreement (as Addison did in this case), he has no burden to show that the issue he would have raised on appeal falls outside of that waiver.  Gaston, 237 F. App'x at 497; Gomez-Diaz, 433 F.3d at 793.

Here, the record is clear that Mr. Harrell did not fail to consult with Addison regarding an appeal or fail to file a requested appeal on Addison's behalf.  Addison claims that, after his sentencing, Harrell discussed his appeal with him but failed to inform him that "failure to file an appeal would likely foreclose any future efforts to alter his sentence, even if there were retroactive changes in the law applicable to his case." (Doc. 799, p. 5.)  Addison also claims that Mr. Harrell told him "that if he appeal[ed] and lost, he would lose his substantial assistance reduction and acceptance of responsibility reduction." (Doc. 844, p. 4.)  Through this discussion, Mr. Harrell "conduct[ed] a specific type of consultation, informing his client about the advantages and disadvantages of appealing and making a reasonable effort to determine the client's wishes." Gomez-Diaz, 433 F.3d at 792.

Addison does not allege that he directed Mr. Harrell to file an appeal at the conclusion of their discussion regarding an appeal.  Indeed, the Post-Conviction Consultation Certificate, which Addison signed on February 26, 2016 (within the time to file an appeal), reflects that Addison advised Mr. Harrell that he did not want to file an appeal  (Doc. 711.)  Through that Notice, Mr. Harrell certified—and Addison agreed—that Mr. Harrell met with Addison, explained to Addison the appellate process and his rights to appeal his conviction and sentence, advised Addison of the advantages and disadvantages of filing an appeal, and thoroughly inquired of him about his interest in appealing.  (Id.)  After this consultation, Addison "decided not to file an appeal, and [Mr. Harrell] explained to [Addison] the consequences of failing to do so."  (Id.)  Addison further acknowledged that "[t]hose consequences include the waiver of [Addison's] right to complain about the process that led up to [Addison's] conviction, including in the future, should [Addison] decide to seek any form of habeas corpus, 28 U.S .C. § 2255, or other judicial relief from the conviction."  (Id.)  Addison certified his agreement with these

statements by printing and signing his name.  (Id.)  Addison has not denied any of the contents of this Notice or otherwise contested the validity of this Notice in any of his pleadings. Additionally, Addison has not alleged that he directed Mr. Harrell to file an appeal after signing this document, in which he states that he did not want to file an appeal.  Thus, if Mr. Harrell had filed an appeal for Addison, he would have directly disregarded his client's written instructions to not file an appeal.

        While Addison now claims that Mr. Harrell failed to explain to him that, by not filing an appeal, Addison would waive future attacks on his sentence, the Notice clearly contradicts this bare allegation.  The Notice shows that Mr. Harrell fully explained the appellate process to Addison, apprised Addison of the advantages and disadvantages of an appeal, fully informed him of the consequences of that decision (including in a Section 2255 proceedings like this), and attempted diligently to ascertain his wishes.  It also shows that Addison expressly instructed Mr. Harrell not to file an appeal.  In the face of nothing more than self-serving conclusions, Addison will not now be heard to declare differently.  Cf. Winthrop-Redin v. United States, 767 F.3d 1210, 1216 (11th Cir. 2014) ("[A] prisoner has everything to gain and nothing to lose from filing a collateral attack upon his guilty plea. . . .  [Consequently,] the representations of the defendant . . . constitute a formidable barrier in any subsequent collateral proceedings.") (quoting Blackledge, 431 U.S. at 71–74); Rosin v. United States, 786 F.3d 873, 878 (11th Cir. 2015) ("It is well-settled that the district court is not required to grant an evidentiary hearing when the defendant's claims are affirmatively contradicted by the record evidence, nor is a hearing required if the claims are grounded upon generalizations that are unsupported by the record evidence.").  In short, the undisputed Notice of Post-Conviction Consultation establishes Addison's informed decision not to take an appeal and thwarts Addison's conclusory claims that

counsel failed to consult with him regarding an appeal.  Price v. United States, No. CR614-016, 2017 WL 525869, at *4 (S.D. Ga. Feb. 8, 2017), *report and recommendation adopted*, No. CR614-016, 2017 WL 1393058 (S.D. Ga. Apr. 11, 2017) (Notice of Post-Conviction Consultation Certification and attorney's affidavit regarding same rebut Section 2255 claim that counsel neglected to apprise movant of the advantages and disadvantages of filing direct appeal); see also Eubank v. United States, No. CR414-005, 2016 WL 750344, at *1 (S.D. Ga. Feb. 25, 2016), *report and recommendation adopted*, No. CR414-005, 2016 WL 1464578 (S.D. Ga. Apr. 13, 2016), *certificate of appealability denied*, No. 16-11933-F, 2016 WL 6246827 (11th Cir. Oct. 25, 2016) (Section 2255 motion denied wherein movant faulted her lawyer for failing to directly appeal, but Notice of Post-Conviction Consultation Certification memorialized her informed decision not to take an appeal); Eason v. United States, No. CR613-007, 2014 WL 4384652, at *3 (S.D. Ga. Sept. 3, 2014), *report and recommendation adopted*, No. CR613-007, 2014 WL 4956680 (S.D. Ga. Oct. 2, 2014) (same).

To the extent that Addison claims that Mr. Harrell rendered ineffective assistance of counsel by giving him deficient advice regarding his chances on appeal, the Court should reject that argument.  Addison has not specifically outlined any advice that Mr. Harrell gave him that was incorrect or otherwise deficient.  The most that Addison has alleged is that Mr. Harrell told Addison that, if he appealed, he could end up with a harsher sentence because he could lose his reduction for substantial assistance or acceptance of responsibility reduction.  (Doc. 844, p. 4.) He also claims that Harrell failed to apprise him that his failure to file an appeal would foreclose any "future efforts to alter his sentence."  (Doc. 799, p. 5.)  However, Addison does not identify these "future efforts" or even identify one issue that Mr. Harrell should have raised on appeal so that it could be preserved for a later challenge.  Addison's conclusory allegations do not suffice

to allege that Mr. Harrell's advice regarding an appeal fell below an "objective standard of reasonableness." Strickland, 466 U.S. at 688. Moreover, even if that advice had fallen below an objective standard, Addison has not demonstrated how he was prejudiced by the deficiency.[7]

The Court may presuppose that the issue underpinning Addison's deficient advice claim is the same sentencing argument he raises above—that he should have been given a reduction under Section 3B1.2 for his minimal role in the offense. If Mr. Harrell advised Addison that he would not likely succeed on these issues on appeal, that advice would not have been deficient. These issues would have failed on appeal because they fall squarely within Addison's plea agreement's direct appeal waiver. See, e.g., United States v. Dandridge, 281 F. App'x 881, 883 (11th Cir. 2008) (appeal waiver barred defendant's argument on direct appeal that district erred at sentencing by denying his request for a minimal role reduction, refusing to adjust his sentence downward in light of the disparity between his sentence and his codefendants' sentences); United States v. Cifuentes, 159 F. App'x 883, 888 (11th Cir. 2005) (appeal waiver barred defendant's argument on directed appeal that court should have granted him minor role reduction because he was less culpable than many of those involved in the conspiracy). Moreover, for the reasons pointed out above, even if the appellate court reached Addison's sentencing arguments, the

---

[7] It is important to note the distinctions between the above-discussed "lost appeal" claim (i.e., that Mr. Harrell failed to file an appeal) and Addison's putative "deficient advice" claim (i.e., that Mr. Harrell misadvised Addison regarding the likelihood of success on appeal). It is not clear if Addison intends to bring one or both of these claims. As to the lost appeal claim, if Addison had directed Mr. Harrell to file an appeal on his behalf and Mr. Harrell failed to do so, that would constitute per se ineffective assistance of counsel. Flores-Ortega, 528 U.S. at 470, 483–86. Thus, on the lost appeal claim, Addison need not demonstrate, and the Court need not assess, whether Addison could have raised meritorious issues on direct appeal. Id. at 477–78. Of course, Addison has not alleged, much less demonstrated, that he directed Mr. Harrell to file an appeal. In contrast, because the deficient advice claim questions counsel's assessment of the merits of an appeal, that claim necessarily involves the proposed grounds for appeal and their validity. On this claim, Addison would be essentially arguing that Mr. Harrell incorrectly told him that certain arguments would not succeed on appeal. Of course, to assess the correctness of counsel's advice, the Court must at the very least know what advice was given. Addison has provided no such information, much less specifically identified the grounds for appeal about which Mr. Harrell misadvised him. While Addison's failure to identify a meritorious ground for appeal would be of no moment to a "lost appeal" claim, it is fatal to his putative "deficient advice" claim.

arguments would not have been meritorious.   Accordingly, it would have been objectively reasonable for Mr. Harrell to advise Addison that his sentencing arguments would not succeed on direct appeal.   Quite the contrary, as part of the "specific type of consultation" required of counsel following sentencing, it would have been proper for Mr. Harrell to honestly communicate to Addison that these arguments lacked merit.  See Gomez-Diaz, 433 F.3d at 792.

Nor was it ineffective for Mr. Harrell to advise Addison that he could receive a higher sentence on remand after an appeal.   When rejecting a similar argument, United States Magistrate Judge G.R. Smith of this District has explained:

> Citing North Carolina v. Pearce, 395 U.S. 711, 89 S. Ct. 2072, 23 L. Ed.2d 656 (1969), [the Section 2255 movant] also argued that [defense counsel] incorrectly advised [the movant] that she might face a higher sentence on remand after a successful appeal.  That, she contended, constituted ineffective assistance.  The law on vindictiveness (what Pearce addresses), however, does not reach so broadly.
>
> Certainly a presumption of vindictiveness arises when a prisoner successfully attacks a jury conviction and is then resentenced by the same judge after a second trial to a harsher sentence with no new evidence presented that justifies the increased prison time.  See Alabama v. Smith, 490 U.S. 794, 802 (1989) (citing Pearce, 395 U.S. at 725–26, 89 S.Ct. 2072).  But no such presumption attaches when, for example, a higher sentence results from a *trial* that occurs on the heels of a successfully attacked *guilty plea*.  See Smith, 490 U.S. at 803.  Nor is a higher sentence problematic under Pearce "when the increased sentence was imposed by the second court in a two-tiered system which gave a defendant convicted of a misdemeanor in an inferior court the right to trial *de novo* in a superior court," Smith, 490 U.S. at 800 (citing Colten v. Kentucky, 407 U.S. 104 (1972)), or when a higher sentence is imposed by a new jury (rather than a judge) after a second trial.  See Chaffin v. Stynchcombe, 412 U.S. 17 (1973).  Most critically, even when the original sentencing judge imposes a higher sentence after his original is overturned on appeal, the new sentence implies no vindictiveness when supported by "on-the-record, wholly logical, nonvindictive reasons."  Texas v. McCullough, 475 U.S. 134, 140 (1986).
>
> When [defense counsel] told [the movant] that "she might get more time at a resentencing," then, he correctly conveyed the risks she faced and made no legal error that qualified as ineffective assistance.  [The movant] very much faced a higher sentence if, upon resentencing, the district judge concluded that record evidence logically supported its imposition and no actual evidence of

43

vindictiveness existed.  <u>See</u> <u>Wasman v. United States</u>, 468 U.S. 559, 568 (1984); <u>see also</u> <u>id.</u> at 567 ("<u>Pearce</u> was not written with a view to protecting against the mere possibility that, once the slate is wiped clean and the prosecution begins anew, a fresh sentence may be higher for some valid reason associated with the need for flexibility and discretion in the sentencing process.").

<u>Diaz v. United States</u>, No. CR413-150, 2016 WL 928670, at *2 n.4 (S.D. Ga. Mar. 7, 2016), *report and recommendation rejected on other grounds*, 192 F. Supp. 3d 1374 (S.D. Ga. 2016).

For all of these reasons, the Court should **DENY** Addison's claim that Mr. Harrell rendered ineffective assistance by failing to properly consult with him regarding an appeal and any putative claim that Mr. Harrell failed to file an appeal on his behalf.

### III.    Leave to Appeal *in Forma Pauperis* and Certificate of Appealability

The Court should also deny Addison leave to appeal *in forma pauperis* and a Certificate of Appealability.  Though Addison has, of course, not yet filed a notice of appeal, it is proper to address these issues in the Court's order of dismissal.  Pursuant to Rule 11 of the Rules Governing Section 2255 Cases, "the district court <u>must</u> issue or deny a certificate of appealability when it issues a final order adverse to the applicant." (Emphasis supplied); <u>see also</u> Fed. R. App. P. 24(a)(3) (trial court may certify that appeal of party proceeding *in forma pauperis* is not taken in good faith "before or after the notice of appeal is filed").

An appeal cannot be taken *in forma pauperis* if the trial court certifies that the appeal is not taken in good faith.  28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a)(3).  Good faith in this context must be judged by an objective standard.  <u>Busch v. Cty. of Volusia</u>, 189 F.R.D. 687, 691 (M.D. Fla. 1999).  A party does not proceed in good faith when he seeks to advance a frivolous claim or argument.  <u>See</u> <u>Coppedge v. United States</u>, 369 U.S. 438, 445 (1962).  A claim or argument is frivolous when it appears the factual allegations are clearly baseless or the legal theories are indisputably meritless.  <u>Neitzke v. Addison</u>, 490 U.S. 319, 327 (1989); <u>Carroll v.</u>

Gross, 984 F.2d 392, 393 (11th Cir. 1993).  Stated another way, an *in forma pauperis* action is frivolous, and thus, not brought in good faith, if it is "without arguable merit either in law or fact."  Napier v. Preslicka, 314 F.3d 528, 531 (11th Cir. 2002); see also Brown v. United States, Nos. 407CV085, 403CR001, 2009 WL 307872, at *1–2 (S.D. Ga. Feb. 9, 2009).

Additionally, under 28 U.S.C. § 2253(c)(1), an appeal cannot be taken from a final order in a habeas proceeding unless a certificate of appealability is issued.  A certificate of appealability may issue only if the applicant makes a substantial showing of a denial of a constitutional right.  The decision to issue a certificate of appealability requires "an overview of the claims in the habeas petition and a general assessment of their merits."  Miller-El v. Cockrell, 537 U.S. 322, 336 (2003).  In order to obtain a certificate of appealability, a petitioner must show "that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Id.  "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further."  Slack v. McDaniel, 529 U.S. 473, 484 (2000); see also Franklin v. Hightower, 215 F.3d 1196, 1199 (11th Cir. 2000).  "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims."  Miller-El, 537 U.S. at 336.

Based on the above analysis of Addison's pleadings and the Government's Response and applying the Certificate of Appealability standards set forth above, there are no discernable issues worthy of a certificate of appeal; therefore, the Court should **DENY** the issuance of a Certificate of Appealability.  If the Court adopts this recommendation and denies Addison a Certificate of Appealability, Addison is advised that he "may not appeal the denial but may seek

a certificate from the court of appeals under Federal Rule of Appellate Procedure 22." Rule 11(a), Rules Governing Section 2255 Cases in the United States District Courts. Furthermore, as there are no non-frivolous issues to raise on appeal, an appeal would not be taken in good faith. Thus, the Court should likewise **DENY** Addison *in forma pauperis* status on appeal.

## CONCLUSION

For the above-stated reasons, I **RECOMMEND** this Court **DENY** Addison's Motion to Vacate, Set Aside, or Correct his Sentence. (Doc. 799.) Further, I **RECOMMEND** that the Court **DIRECT** the Clerk of Court to **CLOSE** this case and enter the appropriate judgment of dismissal. Additionally, the Court should **DENY** Addison a Certificate of Appealability and *in forma pauperis* status on appeal.

The Court **ORDERS** any party seeking to object to this Report and Recommendation to file specific written objections within **fourteen (14) days** of the date on which this Report and Recommendation is entered. Any objections asserting that the Magistrate Judge failed to address any contention raised in the pleading must also be included. Failure to do so will bar any later challenge or review of the factual findings or legal conclusions of the Magistrate Judge. See 28 U.S.C. § 636(b)(1)(C); Thomas v. Arn, 474 U.S. 140 (1985). A copy of the objections must be served upon all other parties to the action. The filing of objections is not a proper vehicle through which to make new allegations or present additional evidence.

Upon receipt of objections meeting the specificity requirement set out above, a United States District Judge will make a *de novo* determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the Magistrate Judge. Objections not meeting the specificity requirement set out above will not be considered by a District Judge. A

party may not appeal a Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  Appeals may be made only from a final judgment entered by or at the direction of a District Judge.  The Court **DIRECTS** the Clerk of Court to serve a copy of this Report and Recommendation upon Addison and Respondent.

   **SO ORDERED** and **REPORTED and RECOMMENDED**, this 21st day of February, 2018.

R. STAN BAKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA